

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

No. 08-24-00046-CV

Princeton Capital Corporation, Appellant/Cross-Appellee

v.

Keith W. Smith and Parkview Capital Credit, Inc., Appellees/Cross-Appellants

On Appeal from the 131st District Court
Bexar County, Texas
Trial Court No. 2021CI02979

## MEMORANDUM OPINION[1]

This appeal involves a guaranty agreement related to a redevelopment of a historic brewery in San Antonio. After a weeklong jury trial, the district court rendered a take-nothing final judgment on the parties' competing claims. More than 20 issues are raised on cross-appeal, including a challenge against the timeliness of appellant's notice of appeal. We hold that our

---

[1] This case was transferred from the Fourth Court of Appeals pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* Tex. Gov't Code § 73.001. We apply the precedent of the Fourth Court of Appeals to the extent it conflicts with our own. *See* Tex. R. App. P. 41.3.

jurisdiction was timely invoked; and, after the jury's verdict is harmonized, we conclude the guaranty agreement was breached and there existed no valid excuse for its nonperformance. We affirm in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND

Princeton Capital Corporation (Princeton), a private lender that makes short-term loans to real-estate developers, financed redevelopment of the Lone Star Brewery property—a 32-acre tract envisioned as a mixed-use residential and retail complex. In 2015, Princeton extended an $8 million construction and development loan to Lone Star Brewery Development, Inc., which executed in return a promissory note and deed of trust granting Princeton a junior lien on the property. The loan was guaranteed by Lone Star's parent, Parkview Capital Credit, Inc. (Parkview), and Keith W. Smith, Parkview's president and sole shareholder. In addition to Princeton, another lender, BI 28, had previously extended a loan to Lone Star and held a senior lien on the brewery property.

Lone Star made two payments before defaulting. Accrued interest, late fees, default interest, and protective advances increased the debt to Princeton from $8 million to approximately $14 million by early 2020. Lone Star filed for Chapter 11 bankruptcy protection in January 2020. The bankruptcy court ordered it to pay all delinquent property taxes by March 31, and to sell the property to whomever presents the highest bid received by April 17, with closing by May 1, or else BI 28 could foreclose by "credit bid"—bidding the amount of its debt instead of cash at the auction—which would extinguish Princeton's junior lien. Facing the bankruptcy court's deadline, Princeton's counsel, Stephen Lecholop, exchanged emails with Tom Rice, Lone Star's bankruptcy counsel, from March 27 through March 31, 2020, in which he sought to avoid the senior lender's foreclosure. Parkview and Smith were not copied on the correspondence. The emails discussed

several proposed instruments intended to carry out the arrangement, including a guaranty agreement and a liquidation plan.

The proposed guaranty required Parkview and Smith, jointly and severally, to repay $90,536.87 that Princeton advanced to pay delinquent ad valorem taxes on the brewery property. The terms of the guaranty evolved over the course of the emails. In his first email on March 27, Lecholop stated that "the guarant[y] would have no effect if the property sells for more than $14mm [$14 million]." This statement was not included in the final draft sent to Lone Star's counsel, Rice, who forwarded it to Smith as Lone Star's CEO. On March 31, Smith signed a Guaranty Agreement (the Guaranty) in both his individual capacity and as managing member of Lone Star's parent, Parkview. Princeton paid the $90,536.87 tax bill that same day.

Princeton and Lone Star also reached an agreement regarding a liquidation plan to be submitted to the bankruptcy court. The parties disagree as to which emails constitute this agreement[2] and what name to give it.[3] Rice described it in his expert testimony as a plan support agreement following standard bankruptcy terminology. The plan support agreement was not memorialized in a separate document but negotiated over the course of emails between Rice and

---

[2] On appeal, Parkview and Smith maintain that the agreement includes (1) a March 30 email with the subject line "Final Agreement and Guaranty" and attached Guaranty document ("Princeton_Lone Star_ Guaranty Agreement (Keith Smith and Parkview)(670804.1 ).docx") and (2) a March 31 email chain with the subject line "Book1.xslx" and attached Excel spreadsheet. Princeton argues the agreement includes only the March 31 email chain, referring to the spreadsheet itself as the plan support agreement and the email chain to which it was attached as the Conditional Compromise. At trial, however, Princeton used the phrase Plan Support Agreement (and synonyms) to refer to both— as well as to the proposed liquidation plan.

[3] On appeal, Parkview and Smith use the term "Final Agreement" and disavow Rice's testimony, arguing that "none of the parties' emails from March 27–31, 2020 refer to a 'plan support agreement' or a 'conditional compromise.'" Throughout their examination of Rice and in their closing argument, Parkview and Smith used the terms as synonymous—e.g., "the Final Agreement or what we sometimes call the Plan Support Agreement" or "what you call in bankruptcy jargon a Plan Support Agreement," "however we want to refer to it, either way." In pretrial filings, Parkview and Smith used the terms settlement agreement, settlement liquidation plan, Final Settlement, and Primary Agreement. Princeton has used the terms plan support agreement, Conditional Compromise, settlement agreement, tentative compromise, Email Compromise, and settlement plan.

Lecholop, with an attached Excel spreadsheet detailing the distributions from a sale of the property and designating the $90,536.87 tax advance as a higher-priority administrative claim.

After entering the plan support agreement, Rice proceeded to draft a plan of liquidation in accord with the agreement, and the property was immediately listed for sale. Among several offers received, only one offeror was willing to close by the bankruptcy court's May 1 deadline. On April 30, Rice presented an emergency motion for authorization to sell the property to that bidder, and the sale closed the following day. Based on the sales price and the payment of creditors under the plan's waterfall method, Rice determined that Princeton would receive $ 380,212.62 and that Parkview would receive $30,215.75.[4] Princeton decided instead to dispense with the proposed plan and filed a motion to convert the case from Chapter 11 to Chapter 7, under which Lone Star's assets would be liquidated without a plan.[5] In the absence of an agreed distribution waterfall, Princeton would receive $678,665.76—constituting all proceeds left after paying off the senior lienholder.[6] At the motion hearing, Rice confirmed that Lone Star was unopposed to the conversion. He requested a 30-day continuance to allow an application for "administrative expenses, including professional fees," and to allow the trustee to pay interim bills for private security on the property. The bankruptcy court ordered the filing of an agreed motion and explained that any "continuation of the Chapter 11 case . . . will not inure to the benefit of other creditors in this case." The signed order permitted the filing of administrative expense claims only to the extent

---

[4] Rice calculated the distribution under the proposed Plan of Liquidation as follows: U.S. Trustee Fee - $144,500, Princeton - $380,212.62 ($90,537 administrative claim for tax advance, $35,000 administrative claim for attorney's fees, $254,675.62 secured claim), Parkview - $190,215.75 ($80,000.00 administrative claim for private security, $80,000.00 administrative claim for attorney's fees, $30,215.75 equity interest), Unsecured creditors - $2,877.69.

[5] *See* 11 U.S.C. § 1112(b)(1), (b)(4)(A) ("[O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for . . . [among other things] substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation[.]").

[6] Rice calculated the distribution under Chapter 7 as follows: U.S. Trustee Fee - $39,140.30, Princeton - $678,665.76 secured claim, Unsecured creditors - $0, Parkview - $0.

required by the Bankruptcy Code and bankruptcy rules. The court subsequently ordered the trustee to distribute $718,614.37 to "secured creditor" Princeton, without reference to the Guaranty. The record does not show any objection to the order. Rice explained at trial that "the reason it wasn't opposed is because the client ultimately decided that for $30,000 it wasn't worth the attorney's fees that would have been spent in order to -- in order to get to the $30,000."

After Parkview failed to repay the $90,536.87 owed under the Guaranty, Princeton filed suit for breach of contract. Parkview counterclaimed for breach of contract and fraud based on statements in the emails, asserting the Guaranty was satisfied when Princeton received its distribution. At trial, the jury charge presented two tracks of questions—one concerning the "Final Agreement" and the other concerning the Guaranty.

The first track began with Question 1, which asked whether "a Final Agreement was formed between the parties[7] via the emails exchanged between March 27, 2020 and March 31, 2020." The jury answered "yes" and then found in Question 6 that Princeton did not "fail to comply with the Final Agreement[.]" Taken together, these answers indicate the jury found that some of the March 27–31 emails formed an agreement among some parties, and Princeton did not breach the agreement formed.

The second track of jury questions addressed the Guaranty. In Questions 4 and 5, the jury found that Parkview and Smith failed to comply with the Guaranty and that Princeton sustained $90,536.87 in damages as a result. No question was asked about formation or terms. The jury then considered Parkview and Smith's affirmative defenses to breach of the Guaranty, which were spread across several questions and appeared to reach contradictory findings. In Questions 13

---

[7] The jury charge did not define the term "parties," raising a question as to whether it referred to the parties to the email correspondence or to the underlying agreements or to the litigation. The parties to the email correspondence and underlying loan agreement were Lone Star and Princeton, by way of their respective counsel, Rice and Lecholop; however, the parties to the Guaranty and to the litigation were Parkview, Smith, and Princeton.

5

and 14, the jury found their failure to comply with the Guaranty was not excused by any failure of Princeton to satisfy conditions precedent or by failure of consideration. But in Question 12, the jury found that Parkview and Smith's "failure to comply with the Guaranty Agreement, if any, [was] excused." The instructions for Question 12 listed four additional possible excuses: Princeton's failure to comply with a material obligation of the "Final Agreement," its prior repudiation of the "Final Agreement," its words or conduct establishing equitable estoppel, and its acceptance of different performance as full satisfaction of Parkview and Smith's obligations under the Guaranty. Question 12 was not conditioned on the jury's answer to any other question, and its instructions made no reference to any other findings—several of which addressed elements of those defenses.[8]

Ultimately, the jury's verdict simultaneously found as follows: that an enforceable email agreement existed and that Princeton did not breach it; that Parkview and Smith breached the Guaranty and caused $90,536.87 in damages that were not in fact repaid from the first dollars of the bankruptcy distribution; and that Parkview and Smith's breach was excused on one or more of the defenses in Question 12—while making other findings that overlapped with those four defenses. In sum, a jury found against Parkview and Smith on their counterclaims and found they breached the Guaranty and caused Princeton $90,536.87 in damages. However, the jury also found

---

[8] Several other findings related to the four excuses listed in the instructions for Question 12 appear elsewhere in the charge. As to the first two listed excuses—failure to comply with a material obligation of the Final Agreement and repudiation of the Final Agreement—the jury found that Princeton did not fail to comply with the Final Agreement (Question 6) and that the Guaranty did not "fail[] for lack of consideration" (Question 13). With respect to equitable estoppel, the jury found that Princeton did not commit fraud on Parkview and Smith under similar instructions (Question 9), that Princeton's promise that the Guaranty would have no effect if the property sold for more than $14 million (Question 2) was not a term of the Final Agreement (Question 3), and that Parkview and Smith did not rely on Princeton's promises in the Final Agreement when signing the Guaranty (Question 8). As to accord and satisfaction, the jury found in Question 15 that Princeton did not "receive payment of $90,536.87 as first moneys in the final distribution it received from the bankruptcy court in the amount of $719,000."

the breach was excused. The trial court denied Princeton's post-trial motion to disregard the excuse finding and rendered judgment that all parties take nothing. This appeal and cross-appeal followed.

## II. Appellate Jurisdiction

As a threshold matter, we first address a challenge brought against our jurisdiction. Parkview and Smith jointly moved to dismiss Princeton's appeal for want of jurisdiction, asserting that Princeton filed notice of appeal late by 61 days. Specifically, they contend the notice needed to be filed within 30 days of the signing of the final judgment, but it was filed instead after 91-days. Princeton counters that exceptions apply and the deadline to perfect appeal was extended from 30 to 91 days for two reasons: (1) because it filed a motion to disregard jury findings, the deadline was extended from 30 to 90 days, and (2) because the last day of the 90-day period fell on Presidents' Day—a state and federal holiday observed in Texas—the deadline was extended to the next day that was not a Saturday, Sunday, or legal holiday. Parkview and Smith retort that Princeton's notice of appeal was timely filed *only if* the post-trial motion is treated as a motion for new trial or as a motion to modify the judgment.[9]

### A. Procedural rules

Several rules of procedure are implicated by the jurisdictional question presented. Under Rule 26.1, a notice of appeal must be filed within 30 days after judgment unless a "timely" motion for new trial or motion to modify the judgment extends the deadline to 90 days. Tex. R. App. P. 26.1(a). Rule 329b(a) defines timeliness for "motions for new trial and motions to modify, correct, or reform judgments," requiring filing "prior to or within thirty days after the judgment . . . is

---

[9] The final judgment was signed on November 21, 2023. Ninety days following that date, Monday, February 19, 2024, fell on Presidents' Day, a state-recognized holiday. Tex. R. App. P. 4.1 (providing that if the last day of a period for performing an act is a Saturday, Sunday, or legal holiday, the period extends to the end of the next day that is not a Saturday, Sunday, or legal holiday); Tex. Gov't Code § 662.003(a)(3) ("the third Monday in February, 'Presidents' Day'"). Applying Rule 4.1, the 90-day period after the date of the final judgment ended on February 20, 2024, which is the day that Princeton filed its notice of appeal.

signed." Tex. R. Civ. P. 329b. Relevant to that provision, Rule 306c provides that prematurely filed motions for new trial are deemed filed "on the date of but subsequent to the time of signing of the judgment the motion assails[.]" *Id.* 306c. Mirroring that provision, Rule 27.2 of our procedural rules allows an appellate court to treat premature actions taken before an appealable order is signed as relating to the appeal of that order. Tex. R. App. P. 27.2.

Rule 301 governs motions to disregard; it provides that, upon motion, the court may enter judgment notwithstanding the verdict (JNOV) and, "upon like motion," may disregard any jury finding unsupported by the evidence. Tex. R. Civ. P. 301. Rule 71 directs courts to treat misnamed filings as if properly styled. Tex. R. Civ. P. 71.

**B. Analysis**

Although the Supreme Court has not squarely addressed whether a motion to disregard jury findings extends the notice-of-appeal deadline, it has held, nonetheless, that a prejudgment JNOV motion was sufficient to extend the appellate deadline. *Ryland Enter., Inc. v. Weatherspoon*, 355 S.W.3d 664, 666 (Tex. 2011) (citing Tex. R. App. P. 26.1(a), 27.2 and Tex. R. Civ. P. 71, 306c, 329b). Relying on *Ryland*, the Fourteenth Court of Appeals concluded, without analysis, that a post-judgment motion to disregard had extended the appellate deadline. *Entrust, Inc. v. Rice Dist. Cmty. Hosp.*, No. 14-14-00196-CV, 2015 WL 5458980 (Tex. App.—Houston [14th Dist.] Sept. 17, 2015, no pet.) (mem. op.). In a pre-*Ryland* case, the Fourth Court of Appeals held that a prejudgment motion to disregard did not extend the appellate deadline. *Miller Brewing Co. v. Villarreal*, 822 S.W.2d 177 (Tex. App.—San Antonio 1991), *rev'd on other grounds*, 829 S.W.2d 770 (Tex. 1992).

Parkview and Smith contend that we should dismiss this appeal under *Miller Brewing* because the decision is non-superseded precedent of the transferor court. They contend that

horizontal stare decisis directs an objective rather than a subjective analysis. *Mitschke v. Borromeo*, 645 S.W.3d 251, 258 (Tex. 2022). That is to say that we must follow materially indistinguishable precedent from the transferor court that has not been expressly or implicitly overruled by the Supreme Court or by the same court sitting en banc. *Id.* In deciding whether a case is distinguishable or overruled, we look to the rule of decision reflected in the judgment and to the facts the court treated as material; statements unnecessary to the decision carry no precedential weight. *Marmon v. Mustang Aviation, Inc.*, 430 S.W.2d 182, 193 n.1 (Tex. 1968).[10]

Applying these principles, *Miller Brewing* turned on one fact: the motion to disregard was filed before judgment. 822 S.W.2d at 180. The court held that, once judgment was signed, the motion was no longer a "live" motion capable of extending the appellate deadline. *Id.* The Supreme Court rejected that same premise in closely analogous contexts—premature JNOV motions, motions for new trial filed before a second judgment, and motions for reconsideration. *Ryland*, 355 S.W.3d at 666 n.1; *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 282 n.2 (Tex. 1994); *Wilkins v. Methodist Health Care Sys.*, 160 S.W.3d 559, 562 (Tex. 2005); *Padilla v. LaFrance*, 907 S.W.2d 454, 458–59 (Tex. 1995). Although the San Antonio Court of Appeals has not expressly overruled *Miller Brewing*, it has recognized that its rationale was rejected by *Ryland*. *Sontag v. Cadena*, No. 04-12-00203-CV, 2013 WL 2122059, at \*2–3 (Tex. App.—San Antonio May 15, 2013, no pet.) (mem. op.).

---

[10] The part of a case that has precedential weight is the "ratio decidendi" or rule of law on which the decision was based. 6 ROY W. MCDONALD & ELAINE A. GRAFTON CARLSON, Tex. Civ. Prac. App. Prac. § 40:16 (2d ed. 2026). *See Ratio Decidendi*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("The rule of law on which a later court thinks that a previous court founded its decision; a general rule without which a case must have been decided otherwise"). The rule of law is generally defined by the "'decision' rather than the opinion or rationale advanced for the decision[,]" *Marmon v. Mustang Aviation, Inc.*, 430 S.W.2d 182, 193 n.1 (Tex. 1968), and it does not include statements in the opinion that are not necessary to a decision, *Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 399 (Tex. 2016). *See also 124 S. Oak St. LLC v. Town of Pecos City*, No. 08-24-00418-CV, 2025 WL 2918426, at \*7 (Tex. App.—El Paso Oct. 14, 2025, no pet.) (mem. op.) (quoting BRYAN A. GARNER, THE LAW OF JUDICIAL PRECEDENT 84 (2016)) ("A decision's authority as precedent is limited to points of law raised by the record, considered by the court, and determined by the outcome.").

Parkview and Smith contend that a motion to disregard is unique because it is properly filed and decided before judgment, whereas the listed motions that extend the deadline under Rule 26.1(a) generally require additional time to decide. *IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp.*, 938 S.W.2d 440, 442–43 (Tex. 1997) (noting that extension "affords the trial court time to consider and decide the motion"). Parkview and Smith thus argue that applying the deadline for a prejudgment motion to disregard would make the rule superfluous, and they distinguish *Ryland* on the ground that the JNOV motion there was coupled with a motion for new trial and a procedural mishap. We find this argument unpersuasive. We do not see a material difference between a motion to disregard and the motions in *Ryland*.

The only material difference between a motion to disregard and a JNOV motion is whether the movant attacks all or only some jury findings. Tex. R. Civ. P. 301; *see also* O'CONNOR'S TEXAS RULES CIVIL TRIALS ch. 9-B, § 1 (2025 ed.) (treating stated motions as interchangeable). *Miller Brewing* recognized that a motion to disregard that sought a substantive change in a verdict would extend the appellate deadline if it attacked a judgment on the verdict. 822 S.W.2d at 179. The fact that a prejudgment motion to disregard does not require additional time to decide does not defeat the purpose of providing an extension; allowing extensions serves the purpose of uniformity and eliminating a procedural pitfall—the same reason for which the procedural rules provide that prejudgment motions for new trial extend the deadline. *Mitschke*, 645 S.W.3d at 261. Imposing a different "live" motion requirement for motions to disregard, as Parkview and Smith request, would force parties to make duplicative pre- and post-judgment filings. *Fredonia*, 881 S.W.2d at 282.

We conclude that *Miller Brewing* was implicitly overruled, and *Ryland* is controlling precedent. Given the functional equivalence of Princeton's motion to disregard and the JNOV

10

motion addressed in *Ryland*, coupled with the Supreme Court's consistent direction to construe procedural rules liberally to preserve a party's right to appeal, we treat Princeton's motion as a timely motion to modify the judgment or motion for new trial. Princeton's notice of appeal, filed within 90 days after judgment (as extended by a legal holiday), was timely and our jurisdiction was properly invoked. We deny Parkview and Smith's motion to dismiss for want of jurisdiction. We sustain Princeton's first issue; we overrule Parkview and Smith's first issue.

### III. ISSUES ON APPEAL

Both sides challenge the judgment rendered on the jury's verdict. Excluding the parties' issues addressing the jurisdictional inquiry, Princeton brings six issues, numbered 2 through 7, while Parkview and Smith bring fifteen, numbered 2 through 16. To avoid duplication, we group and address similar issues together.

Princeton's issues fall into three groups. First, Princeton contends that the jury's answer to Question 12—that Parkview and Smith's breach of the Guaranty was excused—and the trial court's take-nothing judgment cannot be squared with the jury's other findings, including those in Questions 2, 3, 6, 8, and 9, which in Princeton's view negated the factual predicates for prior material breach, repudiation, substitute performance, and estoppel. Second, Princeton argues that, even if some evidence supported submission of the affirmative defenses in Question 12, those defenses were legally unavailable because the Guaranty's waiver-of-defenses provision and the parol-evidence rule barred them. Third, Princeton argues that the "Final Agreement" referenced in the instructions for Question 12 was unenforceable under the Bankruptcy Code and could not serve as the basis for excusing breach of the Guaranty.

As for Parkview and Smith's cross-issues, they fall into four groups. First, they contend there was no evidence to support the jury's findings of breach of the Guaranty and damages

11

because, as they frame it, the Guaranty was dependent on a plan support agreement and they had no obligation to comply with it as a matter of bankruptcy law. Second, they assert that there was evidence to support the jury's finding in Question 12 that their breach of the Guaranty was excused on all affirmative defenses submitted. And in their counter-points, they attack the jury's findings that their breach was not excused by failure of consideration and that they did not sign the Guaranty in detrimental reliance on a representation that it would not be enforced if the sale price exceeded $14 million. Third, they argue that their defenses were not barred by either the parol-evidence rule or the Guaranty's waiver-of-defenses clause, contending there was no effect because the Guaranty was satisfied by performance. Fourth, they challenge the jury's findings of no breach of the "Final Agreement," particularly as to the distribution-waterfall term under which the first dollars of the proceeds were to be applied to repayment of the $90,536.87 tax advance and approximately $30,000 would have gone to Parkview.

In sum, Princeton attacks the jury's finding of excuse, while Parkview and Smith attack the findings determining that they breached the Guaranty, that Princeton suffered $90,536.87 in damages, and that Princeton did not breach the "Final Agreement."

## IV. STANDARD OF REVIEW

Judgments must conform to the pleadings, the proof, and the verdict. Tex. R. Civ. P. 301. Courts have a duty to harmonize jury findings when possible, *Arvizu v. Estate of Puckett*, 364 S.W.3d 273, 276 (Tex. 2012), in light of the pleadings, evidence, and other findings considered as a whole, *Bender v. S. Pac. Transp. Co.*, 600 S.W.2d 257, 260 (Tex. 1980). Jury findings may conflict and still not be fatal to the entry of the judgment, unless one of the findings necessarily requires the entry of a judgment different from that which the court has entered. *Arvizu*, 364 S.W.3d at 276.

12

A trial court may disregard a jury finding only if the issue is immaterial or there is no evidence to support the finding. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994). A jury answer is immaterial if the question should not have been submitted, seeks a determination outside the jury's province, or—though properly submitted—has been rendered immaterial by other findings. *Id.* We make this assessment in light of the pleadings, the evidence, the nature of the case, and the charge as a whole. *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 469 (Tex. 2017). When a trial court's entry of judgment is challenged for failure to disregard immaterial findings, we review the trial court's ruling de novo. *Ruff v. Univ. of St. Thomas*, 582 S.W.3d 707, 712 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

To determine if there is no evidence to support a finding, we review the entire record, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). We sustain a legal-sufficiency complaint only if the record shows a complete absence of a vital fact, the rules of law or evidence bar giving weight to the only proof of a vital fact, the proof of a vital fact is no more than a scintilla, or the opposite of a vital fact is conclusively established. *Id.* at 810. Evidence is conclusive only if reasonable people could not differ in their conclusions, and we do not substitute our judgment for the jury's so long as the proof falls within the zone of reasonable disagreement. *Id.* at 816, 822.

## V. DISCUSSION

Because we must seek to harmonize the jury's findings if possible, we first consider Princeton's argument that the verdict may be reconciled simply by disregarding the jury's excuse finding and entering judgment in the amount of $90,536.87. We then consider Parkview and

13

Smith's contention that no evidence supports the jury's finding of breach of the Guaranty and no breach of the "Final Agreement."

We hold that Question 12 was improperly submitted and that the jury's excuse finding was immaterial. Following that determination, we hold that sufficient evidence supports the jury's remaining findings.

## A. Question 12 and the jury's excuse finding

Question 12 asked the jury whether Parkview and Smith's breach was excused, and the jury answered "yes." The accompanying instructions listed prior material breach, repudiation, equitable estoppel, and accord and satisfaction as excuses.[11] We consider each in turn.

### (1) *Prior material breach*

The jury was instructed under Question 12 that Parkview and Smith's failure to comply with the Guaranty "is excused by [Princeton's] failure to comply with a material obligation of the Final Agreement." We first note that the instruction misstates the law by suggesting that breach of one contract may be excused by breach of another contract. The defense of prior material breach only applies when a plaintiff fails to comply with a material obligation of the same agreement. *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017); *see* PJC 101.18.

---

[11] We note that the charge did not indicate that the four excuses were the *only* possible excuses. The Pattern Jury Charge suggests a broad-form question on whether the defendant's failure to comply was excused and accompanying instructions stating that failure to comply "is excused" under particular theories. *See* PJC 101.7. Some courts have clarified that the excuses listed under the question are exclusive. *See, e.g.*, *Pantaze v. Welton*, No. 05-96-00509-CV, 1999 WL 673448, at *3 (Tex. App.—Dallas Aug. 31, 1999, no pet.) (jury charge instructed that "failure to comply with the agreement is excused if any one or more of the following occurred . . ."). Here, the wording of the jury charge left open the possibility that Parkview Capital and Smith's breach may have been excused for other reasons, possibly including an oft-repeated argument from their counsel that the lawsuit was not worth the parties' or the jury's time.

14

Question 12 also improperly refers to the "Final Agreement," [12] which was not previously defined in the charge. Question 1 initially asked the jury whether "a" Final Agreement was formed via the emails between the parties between March 27 and March 31, which may or may not have included the Guaranty.[13] The trial court refused a proposed question that would determine whether the Guaranty was part of the Final Agreement,[14] as is required by the approved pattern jury charge.[15] The failure of the jury charge to present the terms in dispute was especially problematic

---

[12] The record shows the trial court sua sponte inserted the term "Final Agreement" into the charge, borrowing the subject line of one of the several emails exchanged by the parties between March 27 and 31. The March 27–31 correspondence consisted of three email chains beginning with a March 27 email (subject line: "Lone Star Brewery _Princeton Counteroffer (3/27/20)"), a March 30 email (subject line: "Princeton_Lone Star: Final Agreement and Guaranty"), and a March 31 email (subject line: "Book1.xlsx") to which Rice finally replied, "Then we are in agreement." The record also includes emails with prior offers—e.g., "Lone Star Brewery BK_Princeton Counteroffer (3-26-20)" —dating back to February 23. The court overruled an objection by Princeton that the phrase should either have been defined or should not have been capitalized. The court explained to counsel, "The jury is going to determine what 'Final Agreement' means. It is not defined on purpose, because this is a bunch of factual disputes that you're putting at their feet and they are going to do the best they can." The court then proposed including three breach questions—one for Appellee's breach of the Guaranty and two for breach by either party of the Final Agreement— explaining, "if there's inconsistencies, you-all can just wrap it up with your post verdict arguments." At the same time, it proposed only asking the jury damages questions regarding the Final Agreement, explaining, "Oh, you know what we're doing, we're subsuming the [Guaranty into the] Final Agreement." It explained that the three breach questions would allow the jury to "appreciate perspectives from [Parkview and Smith's] point of view, up to a point, then the question is different. If the Guaranty is part of the Final Agreement, then the question is: Did either party breach the Final Agreement?"

[13] An unsigned copy of the Guaranty was sent to Rice on March 30, 2020, attached to an email (Subject: "Princeton_Lone Star: Final Agreement and Guaranty") stating, "This email is to confirm the final agreement between the Debtor and Princeton. Please respond confirming your agreement. I've also attached the guaranty agreement for Keith and Parkview to sign." A copy of the signature page for Parkview and Smith only was returned by Rice in a March 31, 2020 email (Subject: "FW: Book1.xlsx"), stating, "We are in agreement with the spreadsheet. Please find attached hereto the signature page for the Guaranty agreement."

[14] The question proposed by Parkview and Smith was: "Was the Guaranty dependent upon the Plan Support Agreement"? Princeton suggested a modified version that would conform to the Pattern Jury Charge. Although Parkview and Smith indicated they would agree, the trial court peremptorily ruled that no question would be submitted. When Parkview and Smith objected that three questions would create inherent conflict, explaining that "it's going to get reversed because there's going to be this back and forth for either side," Princeton agreed to omit one question— did Parkview and Smith breach the Final Agreement—resulting in competing breach claims as to two different agreements. When the court finally asked for objections to the question on whether breach of the Guaranty was excused, no party objected or appears to have noticed that the instruction improperly referenced a different agreement. Parkview and Smith's counsel requested only that the question be conditioned on a finding of breach, noting, "The way it's worded now . . . it makes it seem as though the jury did find that we failed to comply with the agreement, *with either the Final Agreement or the Guaranty*" (emphasis added).

[15] The basic question on formation asks, "Did Paul Payne and Don Davis agree [*insert all disputed terms*]?" PJC 101.1 (brackets in original). The Supreme Court approved a variation of this question for contract cases involving correspondence: "Do you find that the writings of *September 2, 2001*, and *October 19, 2001*, constituted an agreement

15

because the parties did *not* dispute—and acknowledged throughout trial—that they had reached *some* agreement via the March 27–31 emails. Question 1 did not present a disputed fact issue, that is, formation of some agreement was conceded, and the issue that was disputed—whether the Guaranty was among the terms of that agreement—was never submitted. No definition, instruction, or question in the charge supports a finding that the Guaranty was a term of the Final Agreement. If a material term remains in dispute, the court is not free to supply it. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221–22 (Tex. 1992). Failure to properly charge the jury with all disputed terms renders inconclusive both the finding that an agreement was formed and the finding that a failure to comply was excused by previous failure to comply with a term of the same agreement, *see* PJC 101.1, 101.18; *see also Foreca, S.A. v. GRD Dev. Co.*, 758 S.W.2d 744, 745 n.1, 746 (Tex. 1988). In short, neither finding shows the jury reached a verdict on the disputed issue. The accompanying instruction on prior material breach of the Final Agreement thus could not enable the jury to render a verdict that breach of the Guaranty was excused, and it should not have been submitted with Question 12. Tex. R. Civ. P. 277; *Spencer*, 876 S.W.2d at 157.

Furthermore, the jury found in Question 6 that Princeton did *not* breach the "Final Agreement." The jury's specific finding of no breach by Princeton controls over its general finding that Parkview and Smith's breach was excused by—among other possible excuses—Princeton's breach of the "Final Agreement." *See Grafa v. Morgan*, 696 S.W.2d 492, 494 (Tex. App.—El Paso 1985, writ dism'd w.o.j.) (explaining that specific findings control over general findings that do not necessarily include the specific findings); *see also In re Rudolph Auto., LLC*, 616 S.W.3d 171, 187 (Tex. App.—El Paso 2020, orig. proceeding) (specific finding of no negligence controls over

_____

whereby [*insert disputed terms*]?" PJC 101.1 cmt (citing *Foreca, S.A. v. GRD Dev. Co.*, 758 S.W.2d 744 (Tex. 1988) (brackets in original)).

general finding of comparative negligence). We conclude that the jury's excuse finding cannot rest on the defense of prior material breach.[16]

### (2) *Repudiation*

The jury was instructed that Parkview and Smith's failure to comply "is also excused by [Princeton]'s prior repudiation of the Final Agreement" and that repudiation occurs when a party "indicates, by [its] words or actions, that [it] is not going to perform [its] obligations under the agreement in the future, showing a fixed intention to abandon, renounce, and refuse to perform the agreement." Any alleged refusal here would necessarily relate to obligations under the "Final Agreement."

Because the jury found Princeton did not fail to comply with the Final Agreement, the jury could not have found repudiation. *Berg v. Wilson*, 353 S.W.3d 166, 179 (Tex. App.—Texarkana 2011, pet. denied) ("Because the jury found that Wilson was not in material breach of the agreement, it could not have logically found repudiation."). This is "especially true" when the alleged repudiation is "supported by the *same facts* alleged to have caused the breach" (emphasis original). *Id.* (emphasis original). Parkview and Smith did not even allege repudiation in their live pleading; and when Princeton objected to submission of a repudiation instruction at the charge conference, Parkview and Smith merely pointed to the same allegations and evidence supporting

---

[16] In addition, the jury specifically found that Parkview and Smith's "failure to comply with the Guaranty Agreement [was not] excused because the Guaranty Agreement failed for lack of consideration." "Failure of consideration" is an older term retained in Rule 94 for prior material breach, *see* PJC 101.18 cmt, Tex. R. Civ. P. 94, while "lack of consideration" refers to the minimum requirement of an act or promise—such as a "peppercorn"—sufficient to form an enforceable contract. *See Kings Park Apartments, Ltd. v. Nat'l Union Fire Ins. Co.*, 101 S.W.3d 525, 532 n.3 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). Although Question 13 blends language from both doctrines, the question as a whole plainly asks whether the Guaranty failed—not whether an agreement existed in the first place. Moreover, the Guaranty states that Parkview and Smith "have received, or *will* receive . . . adequate consideration" for their repayment obligation, using "consideration" in the plain sense of the promised payment obligation. *See Consideration*, Merriam-Webster, https://www.merriam-webster.com/dictionary/consideration (last visited Jul. 22, 2026) ("RECOMPENSE, PAYMENT [- example:] a consideration paid for legal services"). Parkview and Smith concede that it presented the defense of failure of consideration.

their counterclaim for breach of contract. We conclude that the jury's excuse finding cannot rest on the defense of repudiation.

### (3) *Equitable estoppel*

The jury was instructed that Parkview and Smith's failure to comply was also excused under circumstances establishing all elements of the defense of equitable estoppel, including: (1) Princeton "made a false representation or concealed material facts," "with knowledge of the facts or with knowledge or information that would lead a reasonable person to discover the facts," and "with the intention that [Parkview and Smith] would rely on the false representation or concealment in acting or deciding not to act," and (2) Parkview and Smith "did not know and had no means of knowing the real facts" and "relied to their detriment on the false representation or concealment of material facts." In response to a previous question, however, the jury found that Princeton did not commit fraud—similarly defined as occurring when (1) "a party makes a material misrepresentation," (2) "the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion," (3) "the misrepresentation is made with the intention that it should be acted on by the other party," and (4) "the other party relies on the misrepresentation and thereby suffers injury." Parkview and Smith state that the elements are different but do not explain how the different wording makes a substantive difference. Neither party offers authority or argument on this distinction.

In their brief, Parkview and Smith identify only one alleged false representation that would support a finding of equitable estoppel: "[Princeton] falsely represented to [Parkview and Smith] that the Guaranty would have no effect if the property sold for more than $14 million." Indeed, the jury specifically found that Princeton did "represent that the Guaranty Agreement would have no effect and could not be collected against [Parkview and Smith] if the Lone Star Brewery Property

18

sold for more than $14 million[.]" Princeton argues, however, that any reliance on this representation was expressly waived in the Guaranty. In the absence of cited authority, we will assume for purposes of this opinion that the jury could have reached a different finding on equitable estoppel than on fraud. We conclude, however, that the defense of equitable estoppel fails for lack of legally sufficient evidence: because the defense was expressly waived in the Guaranty, evidence supporting should not have been submitted to the jury. *See City of Keller*, 168 S.W.3d at 810–11 (evidence is legally insufficient when giving it weight is barred by a rule of law or when contractual provisions or other contextual evidence render it no evidence). In the Guaranty, Parkview and Smith disclaimed "any" representation made by Princeton or any other party to induce Parkview and Smith to execute the Guaranty, confirmed that the written Guaranty was their entire agreement relative to its subject matter, and expressly waived "any" defense to its enforcement. Princeton maintains that these provisions negate the reliance element of equitable estoppel. *See Moayedi v. Interstate 35/Chisam Road, L.P.*, 438 S.W.3d 1, 6 (Tex. 2014) (enforcing similar waiver of defenses in guaranty agreement providing that the guaranty would not be subject to "any" defense other than full payment, as applied to statutory right of offset). Parkview and Smith argue without authority that such disclaimers do not apply in the equitable estoppel context. Parkview and Smith argue that the waiver of defenses was not "intelligent" based on Smith's testimony that he would not have signed the Guaranty if he knew that Princeton would seek to collect on it even if the property did not sell for more than $14 million. *See id.* (waiver of defenses must be intentional and noting that "whether there has been an 'intelligent waiver' depends on the circumstances of the case"). Parkview and Smith also state, without explanation, that the disclaimer of representations "fails the *Forest Oil* factors and is therefore invalid." *See Forest Oil Corp. v. McAllen*, 268 S.W.3d 51 (Tex. 2008) (unambiguous disclaimer of reliance precludes fraudulent inducement claim as

19

matter of law where (1) the terms of the contract were negotiated; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length transaction; (4) the parties were knowledgeable in business matters; and (5) the disclaimer language was clear). We find no support for these contentions.

Smith, in his testimony as President, CEO, and Chairman of Parkview, confirmed that he understood the disclaimer of representations, waiver of defenses, and entireties provision of the Guaranty. He further testified regarding his training and experience as a lawyer and bank manager who had reviewed more than 100 loan agreements, some of which included personal guaranties, and that he was familiar with standard terms of guaranty agreements. *See* 2 J. SCOTT SHEEHAN, TEXAS PRACTICE GUIDE FINANCIAL TRANSACTIONS: WAIVER OF DEFENSES § 9:114 (2025) (noting "all standard form guaranties contain such waivers"). We find the terms of the Guaranty plainly express an intention to waive defenses based on false representations. We conclude that Parkview and Smith intentionally disclaimed reliance on "any" representation and waived "any" defense to enforcement of the Guaranty. *See Moayedi*, 438 S.W.3d at 6 (rejecting argument that waiver of "any" defenses was not intentional, noting, "we must ask, if that's the case, then what did Moayedi think he was waiving when he waived 'any,' 'each,' and 'every' defense?").

Princeton further argues that the defense of equitable estoppel fails because Parkview and Smith could not reasonably rely on a representation in a preliminary email as to the legal effect of the Guaranty in the event the property sold for less than $14 million. Parkview and Smith do not respond to this argument and we need not consider it. In the absence of any argument that the unambiguous waivers and disclaimers in the Guaranty do not apply to the defense of equitable estoppel, we conclude that this defense should not have been submitted to the jury. We therefore conclude that the jury's excuse finding cannot rest on equitable estoppel.

**(4)** *Accord and satisfaction*

Parkview and Smith's accord-and-satisfaction theory posits that Princeton agreed to accept something (e.g., reimbursement of the tax advance as "first dollars" in its distribution of bankruptcy proceeds) in lieu of performance on the Guaranty. The jury was instructed that Parkview and Smith's failure to comply with the Guaranty is excused if a "different performance was accepted" by Princeton "as full satisfaction of performance of the original obligations of the agreement." However, the jury also found Parkview and Smith failed to comply with the Guaranty (Question 4) and awarded the Guaranty amount of $90,536.87 as damages (Question 5). The parties do not offer authority on whether accord and satisfaction may be independently established when the jury finds the defendant liable for breach.

The jury further found that Princeton did not "receive payment of $90,536.87 as first moneys in the final distribution it received from the bankruptcy court" (Question 15). We note that the wording of Question 15 ("receive payment . . . as first moneys") does not exactly match the satisfaction element of accord-and-satisfaction as instructed in Question 12 ("accepted . . . as full satisfaction"). Parkview and Smith, however, do not dispute that an excuse finding based on accord and satisfaction would conflict with the jury's finding in Question 15. Parkview and Smith instead argue in their cross-appeal that there is no evidence in support of the jury's finding in Question 15.

Princeton responds that there is no evidence of either accord or satisfaction and that the defense was expressly waived. Sister courts have held that waiver-of-defense provisions in guaranties preclude this particular defense. *See BBVA USA v. Francis*, 642 S.W.3d 932, 936 (Tex. App.—Houston [14th Dist.] 2022, no pet.) (citing *Holmes v. Graham Mortgage Corp.*, 449 S.W.3d 257, 265 (Tex. App.—Dallas 2014, pet. denied)). We agree with Princeton. Even if Parkview and Smith's accord-and-satisfaction defense were not specifically negated by other

findings in response to Questions 4, 5, and 15, we conclude the defense was expressly waived in the Guaranty. The jury's excuse finding cannot rest on the defense of accord and satisfaction.

In sum, we conclude that any finding that Appellees' breach of the Guaranty was excused based on prior material breach and repudiation is foreclosed by other findings specifically negating elements of those defenses. We conclude that all other defenses listed in Question 12, including equitable estoppel and accord and satisfaction, were expressly waived by the terms of the Guaranty. We therefore conclude that the trial court erred in submitting these defenses to the jury and in failing to disregard the jury's excuse finding in response to Question 12. We sustain Princeton's fourth and sixth issues, and overrule Parkview and Smith's fourth, sixth, eleventh, and fifteenth issues.[17] Because we conclude that Parkview and Smith's breach of the Guaranty was not excused, we need not address Princeton's remaining issues challenging the admission of evidence and the submission of questions regarding the "Final Agreement" based on legal sufficiency, preemption by the Bankruptcy Code, lack of authentication, improper expert testimony by Rice regarding bankruptcy procedure, and the parol-evidence rule, which are raised by Princeton's second, third, fifth, and seventh issues. Tex. R. App. P. 47.1 (requiring courts of appeals to hand down written opinions that are as brief as practicable but still address every issue raised and necessary to final disposition of the appeal).

## B. The remaining jury findings

After disregarding Question 12's excuse finding as immaterial, the remaining jury answers establish that Parkview and Smith failed to comply with the Guaranty (Question 4) and that Princeton sustained $90,536.87 in damages (Question 5). Those two answers supply all fact

---

[17] Princeton's fourth issue challenges legal sufficiency of Parkview and Smith's defenses in Question 12; Princeton's sixth issue effectively asserts the same issue on grounds of express waiver of defenses. Parkview and Smith's fourth and sixth issues mirror Princeton's fourth and sixth issues; their eleventh and fifteenth issues challenge the adverse findings as to their defenses based on reliance (Question 8) and satisfaction (Question 15).

findings necessary to support judgment for Princeton on its claim for breach of the Guaranty. Based on these findings, we must render judgment for Princeton in the amount of $90,536.87 unless a cross-issue[18] defeats the legal sufficiency of the breach and damages findings, establishes Parkview and Smith's counterclaim for breach of the "Final Agreement" as a matter of law, or otherwise requires a remand. Tex. R. App. P. 43.3 (upon reversal, the appellate court must render the judgment the trial court should have rendered unless remand is necessary). We turn to Parkview and Smith's cross-issues, which challenge the legal sufficiency of those two findings on breach and damages, the negative finding on their counterclaim for breach of the "Final Agreement," and the enforceability of the Guaranty on other grounds.

### (1) *Breach of the guaranty and damages*

Parkview and Smith contend the evidence is legally insufficient to support the jury's findings as to Parkview and Smith's breach of the Guaranty and resulting damages. As previously noted, we review legal-sufficiency challenges under the familiar *City of Keller* standard, crediting

---

[18] We use the term cross-issue to refer to a cross-point asserted by an appellee challenging the jury's verdict. *See Jackson v. Ewton*, 411 S.W.2d 715, 717 (Tex. 1967). While the Rules of Appellate Procedure do not distinguish between issues and points of error, *see* Tex. R. App. P. 38.1 & cmt. to 1997 change, Rule 38.2 still requires the appellee to "bring forward *by cross-point any issue or point* that would have vitiated the verdict or that would have prevented an affirmance of the judgment if the trial court had rendered judgment on the verdict" (emphasis added). Tex. R. App. P. 38.2(b)(1). The Supreme Court has explained that this rule does not require a formal distinction between counter-points and cross-points. *Dudley Constr., Ltd. v. ACT Pipe & Supply, Inc.*, 545 S.W.3d 532, 538 (Tex. 2018) (citing *Jackson*, 411 S.W.2d at 717). Counter-points "assist the appellate court in finding the answers given to the points of the appellant" and "show that the point or points of the opposite party are not valid"; cross-points "are really 'points' which are used to preserve error committed by the trial court. They are the means by which an appellee may bring forward complaints of some ruling or action of the trial court which the appellee alleges constituted error as to him." *Id.* "If an appellee makes an argument only in response to an appellant's point of error—technically, perhaps, a 'counter-point' under the *Jackson* dichotomy—appellate courts should nonetheless consider it a cross-point if, regardless of how or where it is presented, the substance of the argument would nonetheless undermine the jury's original verdict." *Id.* In addition to establishing grounds for reversal or vitiating a verdict, issues presenting independent grounds for affirmance are generally described as cross-points. *City of Austin v. Whittington*, 384 S.W.3d 766, 789 (Tex. 2012). Consistent with current rules, the Supreme Court has used the term cross-issues instead of cross-points. *See, e.g.*, *Walgreens v. McKenzie*, 713 S.W.3d 394, 403 (Tex. 2025); *Hegar v. Am. Multi-Cinema, Inc.*, 605 S.W.3d 35, 43 n.6 (Tex. 2020); *Longview Energy Co. v. Huff Energy Fund LP*, 533 S.W.3d 866, 872 (Tex. 2017). Although the rules do not require formal labels, they generally encourage appellees to present responsive issues (counter-points) in the same order as the appellant's issues, followed by cross-issues (cross-points). *See* Tex. R. App. P. 38.2(a) (providing "[w]hen practicable, the appellee's brief should respond to the appellant's issues or points in the order the appellant presented those issues or points").

evidence that a reasonable juror could have believed and disregarding contrary evidence unless reasonable jurors could not. *City of Keller*,168 S.W.3d at 822, 827. The record includes the Guaranty, its undisputed terms, the existence and amount of the obligation, Parkview and Smith's non-performance, and the amount Princeton was owed and did not receive—$90,536.87— corresponding to the Guaranty obligation the jury found unpaid. On this record, more than a scintilla of evidence supports both breach and damages, and nothing renders either finding conclusively wrong. Parkview and Smith's legal-sufficiency complaints, as presented by their twelfth and thirteenth issues, are overruled.

### (2) *No-breach finding*

Parkview and Smith contend on cross-appeal that no evidence supports the jury's finding of no breach of the "Final Agreement." Because Parkview and Smith bore the burden of proving Princeton's breach, they "must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). They contend that Princeton breached the alleged "Final Agreement" by failing to perform three asserted obligations: (1) paying the delinquent ad valorem taxes, (2) applying "first dollars" from the subsequent property sale to reimburse itself for those taxes, and (3) remitting 10.5% of its distribution to Parkview. They argue that once Princeton received a $718,614.37 distribution from the sale, it was required to treat the first portion of that distribution as repayment of the tax advance and to remit 10.5% to Parkview, but instead sued to collect an additional $90,536.87 on the Guaranty and never paid Parkview its alleged share. The jury rejected this theory twice: it found that Princeton did not fail to comply with the "Final Agreement" (Question 6), and it found that Princeton did not "receive payment of $90,536.87 as first moneys in the final distribution it received from the bankruptcy court in the amount of $719,000"

24

(Question 15). Princeton defends these findings, explaining that the purported obligations of the "Final Agreement"—particularly the "first dollars" and "split proceeds" provisions—were actually terms of the plan of liquidation that Lone Star—as the debtor in bankruptcy—was required to submit to the bankruptcy court under Rule 9019 and 11 U.S.C. § 1121 and thus they were not obligations that Princeton itself was bound to perform. According to Princeton, Lone Star never obtained Rule 9019 approval; and its own counsel conceded that only Lone Star had standing to seek such approval. Princeton further notes that, even apart from Rule 9019, the undisputed evidence shows the Chapter 11 case was voluntarily converted to a Chapter 7 liquidation—an action that nullified the plan support agreement—and that the bankruptcy court's ensuing order directed payment of the $718,614.37 solely as an interim distribution on Princeton's secured claim, not as repayment of the $90,000 tax advance.

We agree with Princeton. Even if the Guaranty were read together with the plan support emails as part of a single, unified instrument, the record shows that the "first dollars" and "split proceeds" provisions were inextricably tied to a proposed liquidation plan that never took effect. The emails between Mr. Lecholop and Mr. Rice describe a proposed liquidation plan in which the $90,536.87 tax advance would be treated as a higher-priority administrative claim and remaining proceeds would be split within an agreed waterfall structure. Those provisions thus have no operative meaning apart from the contemplated plan: they presuppose confirmation and implementation of a plan of liquidation by the bankruptcy court. Mr. Rice confirmed this at trial and expressed surprise in learning on the stand that his client was pursuing a claim for breach of the plan support agreement or "Final Agreement" for roughly $30,000 of split proceeds. To the extent Parkview and Smith are dissatisfied with the bankruptcy court's decision to convert and close the bankruptcy proceeding without confirming the plan and its distribution waterfall, their

25

remedy lay in challenging that course of proceedings in the bankruptcy court. On this record, Parkview and Smith cannot repurpose those unimplemented, plan-dependent terms into an independent basis for finding that Princeton breached a unified "Final Agreement" or for avoiding liability under the Guaranty.

The evidence supports the jury's no-breach finding as to each of the three alleged breaches of the "Final Agreement." The record shows that Princeton made the tax-advance payment required by the Guaranty, which imposes no other express obligations on Princeton. As to the first-dollars and split-proceeds terms, the jury heard evidence that both were conditioned on the bankruptcy court's confirmation of a liquidation plan—confirmation that never occurred. On this record, Parkview and Smith have not demonstrated that the evidence conclusively establishes, as a matter of law, that Princeton failed to comply with the "Final Agreement." We overrule Parkview and Smith's ninth, tenth, and fourteenth issues.

### (3) *Enforceability of the guaranty*

We turn, finally, to Parkview and Smith's remaining contention that the Guaranty is unenforceable. Parkview and Smith maintain throughout their briefing that the "Final Agreement" is enforceable under Texas law and that Bankruptcy Rule 9019 does not govern it. In the alternative, however, they argue that if Princeton is correct that Rule 9019 rendered the "Final Agreement" unenforceable, then the Guaranty—construed as part of a single unified agreement with the "Final Agreement"—fails with it, because the loss of the "Final Agreement" would be a supervening event causing the consideration for the Guaranty to fail.[19]

---

[19] Parkview and Smith present the alternative in three portions of their brief. First, they argue that the trial court erred in "failing to construe the unambiguous Final Agreement and Guaranty as a single, unified agreement that is valid and enforceable as a matter of law." Second, they argue that: "Appellees had no obligation to comply with the Guaranty because either 1) it was satisfied by the 'first dollars' Appellant received in proceeds or 2) it became unenforceable under Appellant's theory that Rule 9019 required bankruptcy court approval of the Final Agreement, which was unified

### (a) *The unified-instrument theory*

We consider first whether the trial court erred by failing to construe the Guaranty and the "Final Agreement" as a single, unified agreement. A court may, in narrow instances, construe instruments executed at the same time for the same purpose as a single contract. *Rieder v. Woods*, 603 S.W.3d 86, 95 & n.36 (Tex. 2020). Assuming the Guaranty could be read together with earlier emails comprising the "Final Agreement," the jury's finding that Princeton did not fail to comply with the "Final Agreement" is equally a finding that Princeton did not commit a prior breach of the unified agreement, and we have already held that finding is supported by legally sufficient evidence. *See supra* § V.B.2. As a matter of Texas contract law, the failure to submit unification did not cause the rendition of an improper judgment. The unified construction only matters if the "Final Agreement" is unenforceable under federal bankruptcy law. We turn to that question now.[20]

### (b) *Bankruptcy Rule 9019*

Federal Rule of Bankruptcy Procedure 9019 governs compromises affecting the bankruptcy estate and distributions to creditors. It does not apply to agreements that do not alter the estate—such as disputes regarding whether a particular debt is excepted from discharge. *In re OptInRealBig.com, LLC*, 345 B.R. 277, 291 (Bankr. D. Colo. 2006) (Rule 9019 not implicated where settlement governed only parties' rights if the case were dismissed); *In re Hass*, 273 B.R.

---

with and/or incorporated the Guaranty." Third, in their sixteenth issue: "In the event the Guaranty remains enforceable and unsatisfied, but the Final Agreement does not, the Guaranty fails for lack of consideration." As explained supra n.16, Question 13 asked whether the Guaranty failed for lack of consideration, and the jury answered no; and this finding was equivalent to finding that Princeton did not commit a prior breach of the Guaranty.

[20] At the charge conference, Parkview and Smith further urged that failing to submit a unification question to the jury or otherwise define the "Final Agreement" risked inherent conflict in the verdict. *See supra* n.14. On appeal, they do not assign charge error or seek a new trial; they ask instead that we construe the agreements as unified and render judgment on the excuse finding. A complaint that a defective submission produced an improper judgment would normally support, at most, a remand for a new trial—not the rendition they seek—and no such complaint is presented. *See Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43–44 (Tex. 2007) (holding the proper remedy for a defectively submitted theory of recovery is remand for a new trial where legally sufficient evidence supports the claim); *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 228–29 & n.17 (Tex. 2019) (declining to reach a charge complaint not preserved by objection or raised on appeal).

45, 50 (Bankr. S.D.N.Y. 2002) ("Settlement of a controversy under Section 523(a) generally affects only the particular creditor and the debtor post-petition (in a Chapter 7 case), and approval of such a compromise generally will not affect the rights of parties interested in the debtor's estate.").

As this Court has explained, 11 U.S.C. § 524(e) provides that a debtor's discharge "does not affect the liability of any other entity on . . . such debt," and it is well-settled that a bankruptcy discharge does not release a guarantor. *Austin Hardwoods, Inc. v. Vanden Berghe*, 917 S.W.2d 320, 324 (Tex. App.—El Paso 1995, writ denied) (citing *NCNB Texas Nat'l Bank v. Johnson*, 11 F.3d 1260, 1266 (5th Cir. 1994)); *see also Swinford v. Allied Fin. Co.*, 424 S.W.2d 298, 302 (Tex. App.—Dallas 1968, writ dism'd) ("It is settled law that a discharge in bankruptcy is personal to the bankrupt and does not have the effect of concealing or releasing the liability of a person jointly liable for a debt."); *Jain v. PlainsCapital Bank*, No. 10-15-00396-CV, 2017 WL 1540715, at *5 (Tex. App.—Waco Apr. 26, 2017, no pet.) (bankruptcy proceedings had "no effect" on liability under guaranty).

A bankruptcy court may enjoin guaranty enforcement only in "exceptional circumstances." *Plaza of the Americas, Ltd. v. Rodgers*, 728 S.W.2d 827, 828 (Tex. App.—Dallas 1987, no writ) (citing 11 U.S.C. § 105 (Supp. 1986)). Such circumstances generally involve findings that enforcing the guaranty would significantly hinder the debtor's rehabilitation. *Id.* Absent such an injunction, confirmation alone does not bar enforcement. *Id.*; *Caprock Inv. Corp. v. FDIC*, 17 S.W.3d 707, 714 (Tex. App.—Eastland 2000, pet. denied) (confirmation order, without plan in evidence, did not affect guaranty). Bankruptcy courts may set off mutual debts, *Bandy v. First State Bank*, 835 S.W.2d 609, 618 (Tex. 1992), but they lack authority to extinguish non-debtor claims without consent. *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 220–21 (2024).

28

The Rule 9019 theory Parkview and Smith invoke in the alternative provides no basis to avoid liability on the Guaranty. The jury's findings and the nature of this dispute do not affect estate assets or creditor distributions; they concern only Parkview and Smith's separate, state-law promise to pay Princeton. Nothing in the record suggests the bankruptcy court enjoined, set off, or otherwise limited Princeton's rights under the Guaranty. Because Rule 9019 did not render the "Final Agreement" unenforceable, the supervening event on which Parkview and Smith's alternative consideration argument depends never occurred, and the jury's answer to Question 13 stands. *See supra* n.16. On this record, neither the unified-agreement construction nor federal bankruptcy law bars rendition of judgment for breach of the Guaranty. We overrule Parkview and Smith's second, eighth, and sixteenth issues. Because we have assumed in Parkview and Smith's favor that the extrinsic evidence and the challenged testimony were properly admitted, their third, fifth, and seventh issues present nothing further for our review, and we need not address them. Tex. R. Ajapp. P. 47.1.

## VI. CONCLUSION

We reverse the portion of the judgment ordering that Princeton take nothing on its Guaranty claim and render judgment that Princeton recover $90,536.87 from Parkview Capital Credit, Inc., and Keith W. Smith, together with costs of court in the trial court and on appeal. We remand the case to the trial court (1) to determine and award prejudgment and post-judgment interest in accordance with Chapter 304 of the Texas Finance Code and any applicable terms of the Guaranty, with post-judgment interest accruing from the date of the trial court's judgment, and (2) to determine entitlement to and the amount of reasonable and necessary attorney's fees, if any. *See* Tex. Fin. Code ch. 304. We affirm the judgment in all other respects, including the take-nothing disposition of Parkview and Smith's counterclaims.

GINA M. PALAFOX, Justice

July 30, 2026

Before Salas Mendoza, C.J., Palafox and Soto, JJ.